OPINION OF THE COURT
John W. Sweeny, J.
This is a CPLR article 78 proceeding in which the petitioners seek a judgment annulling the December 28, 1977 decision of the Town Board of the Town of Tuxedo whereby the respondents, Sterling Forest Development Corp. (Sterling) and U. I. D. C. of New York, Inc., were granted, among other rights, special permit approval for a 3,900 unit planned integrated development.
At the outset, the court rejects respondents’ challenge to the standing of the petitioners. As owners of property in close proximity to this proposed development which will eventually almost quadruple the town’s present population, the individual petitioners would certainly have standing to challenge the town board’s determination, even without applying the broad rule on "standing” espoused by the Court of Appeals in Matter of Douglaston Civic Assn. v Galvin (36 NY2d 1). Also, under the standing criteria set forth for organizations in Matter of Douglaston (supra, p 7) the petitioner associations would have standing since their members also may be adversely affected by respondents’ action. Definitive proof of actual harm should not be a necessary condition to the right to challenge zoning decisions. Additionally, the respondents would seem to be collaterally estopped from raising the issue of standing with respect to those petitioners who were plain *5 tiffs in Tuxedo Conservation & Taxpayers Assn. v Town Bd. of Town of Tuxedo (Supreme Ct, Orange County, Dec. 20, 1977, O’Gorman, J.).
Considering the diverse positions taken by the members of the present town board, positions so diametrically opposed with respect to this development that they could not even agree on the selection of counsel to respond to Sterling’s companion proceeding against the town until directed by this court to submit an answer or default, it would seem most appropriate for concerned and apparently knowledgeable civic associations to actively pursue a matter of this significance.
The pivotal incident which gave rise to the instant proceeding was a three-two vote of the previously constituted town board on December 22, 1977 whereby it approved an amendment to the town’s local version of the State Environmental Quality Review Act (SEQRA) (ECL art 8). The amendment effected a substitution of the town board as the "lead agency” (ECL 8-0111, subd 6) in place of the planning board.
The authority of the town board to amend the local law is not seriously questioned, nor can the motive behind a legislative act of this nature be reviewed by the courts (Bacon v Miller, 247 NY 311, 317-318).
The petitioners’ arguments are based on the following facts:
(1) On December 22, 1977 the town board stepped into the shoes of the planning board which had been managing, since mid-July 1977, the somewhat complicated procedure of orchestrating and reviewing the reports and studies necessary for the submission of the Environmental Impact Statement (EIS) in accordance with the requirements of ECL 8-0109. At the time of the amendment, the planning board had not only made the initial determination that an EIS was required but had accepted the Draft Environmental Impact Statement (DEIS), noticed and held a public hearing on the DEIS on December 7, 1977 and had, on December 15, 1977, granted a request from the Department of Environmental Conservation (DEC) and the New York Attorney-General for an extension of time until January 7, 1978 to permit these agencies to submit comments on the DEIS.
(2) Immediately after passing its resolution to amend the local SEQRA law, the town board directed the applicant (Sterling) to prepare and file a final Environmental Impact Statement. Sterling filed an EIS, dated December 21, 1977, that very day, December 22, 1977.
*6 (3) The town board ignored the resolution of the planning board extending the DEC and Attorney-General’s time to submit comments on the DEIS.
(4) The town board met in unannounced, closed "work sessions” before and after December 22, 1977 to review and discuss Sterling I.
(5) The town board approved a special permit for Sterling I by a three-two vote on December 28, 1977 before the State agencies and the public (the petitioners) had submitted comments on the DEIS and
(6) One member of the majority vote of the town board, a vice-president of the advertising firm which handles the account of City Investing Corp., of which Sterling Forest Development Corp. is a wholly owned subsidiary, declined to disqualify himself in this matter.
The fact that the town board substituted itself as the "lead agency” at the eleventh hour and frenetically worked to reach a conclusion in this matter is not in and of itself a ground to vacate its decision. The question is whether or not under the circumstances the town board had an opportunity to make an "informed” decision (Matter of Weekes v O’Connell, 304 NY 259, 265).
We are not presented here with a situation where credibility of witnesses before the planning board is a substantial issue (cf. Smith v State of New York, 214 NY 140). The information before the planning board was primarily, if not exclusively, objective and technical documentary evidence. It also appears that the town board members were in fact present during the public hearings. In any case, since the town board members had access to the data accumulated prior to the date they assumed the role as "lead agency,” they could have been in a position to make an "informed” decision (Matter of Taub v Pirnie, 3 NY2d 188, 194-195).
However, the petitioners’ remaining objections find support in the record.
Much of respondents’ argument is in support of the viability of the Environmental Impact Statement prepared by the respondent, Sterling. However, the essential quality of this EIS is not necessarily a dispositive issue in this proceeding even though the petitioners as well as the Department of Environmental Conservation allege that the EIS is in fact legally incomplete. The basic contention of the petitioners is *7 that the respondents did not comply with either the letter or the spirit of the SEQRA and the DEC’s implementing regulations (6 NYCRR Part 617) during the latter part of December, 1977 when the final and crucial stages of the EIS procedures were completed pell-mell by the town board.
SEQRA was modeled after the National Environmental Policy Act (NEPA). Its purpose was to permit State and local agencies "to intelligently assess and weigh environmental factors along with social, economic and other relevant considerations in determining whether or not a project or activity should be approved or undertaken” (see legislative memorandum of Assemblyman Posner, NY Legis Ann, 1975, p 438).
ECL 8-0109 (subd 6) specifically requires that the EIS "together with comments of public and federal agencies and members of the public, shall be filed with the commissioner and made available to the public prior to acting on the proposal”.
6 NYCRR 617.9 (a) specifies that, "Prior to the lead agency’s decision on an action which has been the subject of a final EIS, it shall afford agencies and the public a reasonable time period in which to consider the ñnal EIS.” (Emphasis supplied.) Under the model Federal regulations, a lead agency is prohibited from acting on a proposed project until 30 days have passed from the date the final EIS has been made available to community agencies and the public (40 CFR 1500.11 [b]). 6 NYCRR 617.9 (b) provides that "except for good cause” a decision must be made within 30 days of the date of filing of the final EIS.
In this case, the town board approved the Sterling I project on December 28, 1977, which was only the fourth business day after the applicant (in violation of the intent of ECL 8-0109, subd 3, and the provisions of 6 NYCRR 617.6 [h], 617.7 [h], which require the lead agency to complete and file the EIS) had filed the EIS with the DEC and other interested agencies.
Considering the breadth of this proposed $200,000,000 project which will, when completed, essentially quadruple the population of the respondent municipality and probably impose equally proportionate demands on municipal services and the environment, this court finds that the hasty December 28, 1977 decision of the town board constituted a gross abuse of discretion which deprived State agencies and the public of their statutory right to a reasonable time period in which to consider the final EIS.
*8 The municipality’s own expert, Ecolsciences, Inc., did not have an opportunity to review the statement until December 27, 1977, and even it concluded that within the "brief’ period allotted for review it "could not validate the technical accuracy of the data contained in the Final EIS.” This is rather conclusive evidence that the town board did not have a reasonable opportunity to make an intelligent assessment of this significant proposal and that other agencies and the public were not given a reasonable time in which to consider the matter.
Additionally, it was at least an abuse of discretion, if not illegal, for the town board to tacitly countermand the resolution of the planning board with respect to the time extension granted by the latter for the DEC and the Attorney-General to comment on the DEIS. While it may not have been initially proper for the town to mechanically designate its planning board as the "lead agency” for all SEQRA matters, without regard to the actual extent of that agency’s involvement in a particular action, there is no serious suggestion that the planning board’s other actions involving this project were void. Since the respondents have accepted the substantial preliminary actions of the planning board as a proper foundation for the actions taken by the respondent town board between December 22 and 28, 1977, they cannot be heard to challenge a discretionary decision of the planning board to extend until January 7, 1978 the time for comments on the DEIS.
This reasonable extension is apparently not prohibited by the State enactment or the DEC regulations. In fact, a fair reading of 6 NYCRR 617.6 (j), 617.6 (j) (2) (i), (iii); 617.9 (b) of the DEC regulations would seem to support the authority to extend the time period in this case as long as the extension was within the restrictions set forth in those sections.
The record in this matter also establishes the fact that the town board, both before and after it assumed jurisdiction over the pending proceedings for an EIS, conducted several private "work sessions” without public notice, in violation of the provisions of article 7 of the Public Officers Law (Matter of Orange County Pub., Div. of Ottaway Newspapers v Council of City of Newburgh, 60 AD2d 409). At the last of these closed meetings, it appears that the board even had an expert present who advised its members for a few hours on technical aspects of the EIS.
*9 Finally, while this court finds no evidence of any actual conflict of interest of any board member in this matter, because of the possible appearance of impropriety, this court believes that Councilman Martineau, one of the three-man majority vote, should have disqualified himself from voting at the December 28, 1977 meeting involving Sterling I.
In 1964 the State Legislature passed article 18 of the General Municipal Law (conflicts of interest of municipal officers and employees) "to define areas of conflicts of interest in municipal transactions” (Legislative Findings, McKinney’s Cons Laws of NY, Book 23, General Municipal Law, p 514; emphasis supplied). The bulk of article 18 concerns itself with specifically defined conflicts of interests involving contractual dealings in which municipal officers may have some direct or indirect interest. The final section (General Municipal Law, § 809) speaks to the issue of conflicting interests in zoning matters. However, there are specified therein only four instances when a board member is "deemed” to have an interest in a zoning application before the board of which he or she is a member, namely (§ 809, subd 2):
"When he, his spouse, or their brothers, sisters, parents, children, grandchildren, or the spouse of any of them
"[a] is the applicant, or
"[b] is an officer, director, partner or employee of the applicant, or
"[c] legally or beneficially owns or controls stock of a corporate applicant or is a member of a partnership or association applicant, or
"[d] is a party to an agreement with such an applicant, expressed or implied, whereby he may receive any payment or other benefit, whether or not for services rendered, dependent or contingent upon the favorable approval of such application, petition or request.”
These few obvious categories can hardly be considered an attempt at establishing an all-inclusive list of possible conflicts with respect to noncontractual matters.
Clearly, this statutory list was meant to set forth only those situations in which there is a conclusive presumption of a conflicting interest. It is recognized that because of the myriad possibilities of disqualifying conflicting interests in quasi-judicial matters, disqualification should be a factual issue gov *10 erned by the circumstances of each case and that a definitive rule cannot be formulated (10 ALR3d 694).
The facts in this case are that board member Martineau was a vice-president of Ogilvy & Mather International, Inc., an international advertising agency which lists among its corporate clients City Investing Corp. The respondent, Sterling, which was the corporate applicant before the board, is a wholly owned subsidiary of City Investing. The "corporate veil” removed, it can be said that City Investing Corp.’s interests were before the town board. It is apparently conceded that if the Sterling I development becomes a reality, the rather substantial advertising account for this $200,000,000 project will actively be sought by Ogilvy & Mather International, Inc.
Members of a zoning committee, "as public officers impressed with the duty of conducting a fair and impartial fact-finding hearing upon issues significantly affecting individual property rights as well as community interests, must so far as practicable * * * be open minded, objective, impartial and free of entangling influences or the taint thereof [citation omitted]. They must be capable of hearing the weak voices as well as the strong. To permit otherwise would impair the requisite public confidence in the integrity of the planning commission and its hearing procedures.” (Chrobuck v Snohomish County, 78 Wn 2d 858, 869.) "It is axiomatic that, whenever the law requires a hearing of any sort as a condition precedent to the power to proceed, it means a fair hearing, a hearing not only fair in substance, but fair in appearance as well.” (Smith v Skagit County, 75 Wn 2d 715, 739.) (Emphasis supplied.)
It is not all that unjustified or unreasonable for members of the public to perceive an appearance of conflicting interests when they know that a top executive of a corporate advertising agency is in a position to cast a crucial vote in a quasi-judicial proceeding involving a $200,000,000 venture of one of his agency’s clients. Considering the scope of this application (1,500 acres, 3,900 units and one fifth of a billion dollars), only the naive would not suspect that there could be tacit business pressures conflicting with the right of the public to a fair hearing. While respondents characterize this apparent conflict as an "absurdity” and suggest that it is too speculative (cf. Town of North Hempstead v Village of North Hills, 38 NY2d 334, 344), the fact is that Mr. Martineau himself foresaw the *11 possibility of an appearance of conflict and even asked for an opinion on the matter, which was never forthcoming, from the local ethics committee (cf. General Municipal Law, § 808).
The attempt by the respondents to demonstrate the insignificance of any benefit which Mr. Martineau derives from City Investing’s account could be somewhat misleading since percentages are based on worldwide business revenues in 26 different countries and not present and possible future revenues generated by the New York City office.
Therefore, based on the facts surrounding this zoning proceeding, magnified as they are by the size and cost of the project, this court believes that Mr. Martineau should have disqualified himself because of the appearance that a fair hearing may not have been possible.
For all of the above reasons, the court grants petitioners’ application and hereby annuls the December 28, 1977 action of the town board and remits this matter for further proceedings at which the DEC, the Attorney-General, and the public shall be given a reasonable opportunity to comment on the EIS.